RECEIPT # 56999
AMOUNT $ 150
SUMMONS ISSUED ✓
LOCAL RULE 4.1
WAIVER FORM
MCF ISSUED
BY DPTY CLK.
DATE 6-30-04

ORIGINAL

FILED
IN CLERKS OFFICE
2004 JUN 30 P 3:38
U.S. DISTRICT COURT
DISTRICT OF MASS.

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

MARIO LACY,  )
    Plaintiff  )  C.A No. _____
  )
v.  )  **COMPLAINT**
  )  04 - 11492 REK
WILLIAM J. FEENEY, KENNETH  )
HEARNS, JUAN J. SEOANE,  )
and the CITY OF BOSTON,  )
    Defendants  )
  )

MAGISTRATE JUDGE Alexander

## INTRODUCTION

1. This is an action for money damages for violations of the plaintiff's constitutional rights brought pursuant to 42 U.S.C. §1983. Plaintiff Mario Lacy alleges that Defendants Kenneth Hearns and Juan J. Seoane, with the authority of their supervisor, Defendant Sergeant Detective William J. Feeney, conducted an anal cavity search of him in violation of the Fourth and Fourteenth Amendments to the United States Constitution and the Massachusetts civil rights statute, M.G.L. c. 12, §11I.

## JURISDICTION

2. Jurisdiction is based upon 28 U.S.C. §§1331 and 1343, and on the pendent jurisdiction of this Court to entertain related claims arising under state law.

## PARTIES

3. Plaintiff Mario Lacy is a resident of Boston, Suffolk County, Massachusetts.

4. Defendant William J. Feeney is a Sergeant Detective in the Boston Police Department and was acting under color of law as the supervisor of this drug unit at all times relative to this Complaint, and is sued in his individual capacity.

5. Defendant Kenneth Hearns was a police officer acting under color of law at all times relative to this Complaint and is sued in his individual capacity as a police officer for the Defendant City of Boston.

6. Defendant Juan J. Seoane is a police officer acting under color of law at all times relative to this Complaint and is sued in his individual capacity as a police officer for the Defendant City of Boston

7. Defendant City of Boston is a municipality.

## FACTS

8. The Plaintiff has struggled much of his life with drug addiction.

9. While he was on Marvin Street in Dudley Station in Roxbury on or about July 14, 2001 at about 6:00 p.m., two police officers jumped out of their vehicle and approached the Plaintiff.

10. The police officers searched the Plaintiff by pulling out his pants and looking down. They found no drugs.

11. Then the Defendants Hearns and Seoane came over and accused the Plaintiff of having drugs on his person. The Plaintiff denied the allegation.

12. They went into the Plaintiff's pockets and felt the seams of his clothes.

13. Finding no drugs, they led the Plaintiff into a small alley.

14. Defendant Hearns went to his vehicle and returned with an evidence bag.

15. Defendant Hearns pulled the Plaintiff's pants and underwear down from behind him.

16. Defendant Hearns felt the Plaintiff's gonads.

17. Then Defendant Hearns stuck his finger into the Plaintiff's anus.

18. While Defendant Hearns was raping the Plaintiff from the rear, Defendant Seoane was holding the Plaintiff while facing him.

19. Plaintiff struggled and attempted to force Defendant Hearns to remove his finger.

20. Defendant Seoane said to the Plaintiff, "Are you trying to assault Kenny?"

21. Defendant Seoane then turned the Plaintiff around so that he faced Defendant Hearns. The latter smacked the Plaintiff in the face.

22. Defendant Hearns then turned the Plaintiff around and again raped him by thrusting his finger up into the Plaintiff's anus again.

23. The Plaintiff pulled his pants up himself.

24. The Plaintiff made a fresh compliant of the rape to two women he knew at Dudley Station.

25. The Plaintiff then proceeded to Boston Medical Center where a rape kit was prepared.

26. The hospital called the police.

27. The police took the Plaintiff back to the scene of the crime where they took photographs and seized evidence, including an evidence glove.

28. A substance was observed on the glove and sent for analysis.

29. Defendants Hearns and Seoane, in addition to violating the Plaintiff's constitutional rights, also violated Boston Police Rule 318(D)-(4) which requires that an officer, even when a person is in custody, have probably cause that an individual has contraband in order to conduct a strip search.

30. As the Plaintiff was not in custody as that term is traditionally defined, the strip-search was especially egregious.

31. The Defendants also violated Rule 318(D)-(5) in that they conducted a body cavity search without a "high degree of probable cause" and a search warrant, as required by

regulations. The rule, in fact, does not allow a police officer to conduct a body cavity search even if warranted as it must only be done by a qualified medical professional.

32. Apparently, there is still a custom within the drug units of the Boston Police of illegal strip searches even in public domains, including invasive anal cavity searches in spite of a formal policy forbidding them.

33. The Boston Police Drug Units prey on and rape the most vulnerable in our society -- those addicted to drugs.

34. The Plaintiff has suffered great emotional distress as a result of the Defendants' rape of him.

## COUNT I
## VIOLATION OF 42 U.S.C. §1983 BY DEFENDANT POLICE OFFICERS

35. The Plaintiff restates the allegations in paragraphs 1 through 34 and incorporates said paragraphs herein as paragraph 35.

36. By the actions alleged in paragraphs 1 through 35, the Defendants deprived the Plaintiff of his right to be free from unreasonable searches in violation of 42 U.S.C. §1983 and his Fourth and Fourteenth Amendment rights as guaranteed by the United States Constitution.

## COUNT II
## VIOLATION OF MASSACHUSETTS CIVIL RIGHTS ACT: M.G.L. c. 12, §11I BY DEFENDANT POLICE OFFICERS HEARNS AND SEOANE

37. The Plaintiff restates the allegations in paragraphs 1 through 36 and incorporates said paragraphs herein as paragraph 37.

38. By the actions described in paragraphs 1 through 37, the Defendants violated the Plaintiff's civil rights in violation of M.G.L. c. 12, §11I, by threats, intimidation, and violence.

## COUNT III
## VIOLATION OF 42 U.S.C. §1983 BY DEFENDANT CITY OF BOSTON

39. The plaintiff restates the allegations in paragraphs 1 through 38 and incorporates said paragraphs herein as paragraph 39.

40. The City of Boston has a custom and policy of deliberate indifference to the rights of citizens by not adequately training and supervising its police officers as to proper search procedures in executing search warrants in drug investigations.

41. The City of Boston has a custom and policy of deliberate indifference to the rights of its citizens by not adequately supervising officers who are prone to conducting illegal strip-searches in spite of a Boston Police Regulation that severely limits the authority to conduct such searches.

42. The City of Boston has a custom and policy of deliberate indifference to the rights of its citizens by not adequately investigating citizens' complaints against its police officers, nor taking prompt disciplinary action against officers who violate the rights of citizens and commit perjury.

43. This custom and policy goes back many years. As far back as 1981, a Superior Court judge found that Detective Arthur Linsky lied before the grand jury in the case of *Commonwealth v. Salmon*, 387 Mass. 160 (1982), but no disciplinary action was taken against him by the Boston Police.

44. In 1991, the then-Mayor of Boston, Raymond Flynn, requested that a special commission review the practices of the Boston police. The St. Clair Report was submitted on January 14, 1992.

45. The Report found a wide range of problems in the police department's Internal Affairs Division.

46. It reviewed complaints filed against Boston Police Department personnel since 1981.

5

47. The Report found that only 5.9% of the complaints were sustained and that such a statistic "strains the imagination as it assures 94% of the complaints are without merit."

48. The defendant City of Boston's policies, practices, or customs, as described in paragraphs 29 and 31, are illustrated by, but not limited to the following conduct:

   a. Christopher Harding was wrongfully arrested and convicted of attempted murder because members of the Boston police department committed perjury and withheld exculpatory evidence. On August 18, 1989, a shooting took place in the Mission Hill Housing Project where Mr. Harding lived. Boston police officers captured one suspect but the other fled. Officer Terrence O'Neil claimed he saw Mr. Harding running away and that Mr. Harding fired three shots, one of which was fired at him. Officer Mitchell wrote a report supporting O'Neil's claims, which she knew were false. Boston police officer Michael Stratton testified at trial that he witnessed Mr. Harding shoot at O'Neil. The officers' version of the events was proven to be false by a ballistics expert before trial. The expert proved conclusively that the bullet that struck the victim had been fired from the gun belonging to the second suspect and that only three bullets were fired from that gun. Thus, it was impossible for O'Neil, Stratton, or Mitchell to have witnessed three shots fired from that gun, as they claimed. The Boston Police Department suppressed this crucial exculpatory evidence of the ballistic expert's findings until just prior to Mr. Harding's trial. In addition, because she might have recanted her earlier report, the Boston Police Department falsely stated that Officer Mitchell was out of town during the trial and could not testify, thereby suppressing exculpatory evidence. Mr. Harding was released after spending approximately seven years in jail. Boston Police Officers Stratton and Mitchell have never been disciplined in connection with this misconduct and O'Neil was not fired for his involvement until January 20, 2000.

6

b. City of Boston police officers falsely arrested Gary Willoughby in September 1989, and charged him with homicide. He was a poor Jamaican immigrant with no criminal record and no connection to the incident. After a police officer committed perjury before the grand jury, Mr. Willoughby was acquitted of all wrongdoing in 1990. He subsequently sued the City of Boston and the police officer. The City paid for the officer's defense and, in 1994, it compensated Mr. Willoughby for the wrongs committed against him. The police officer involved has never been disciplined in connection with this incident.

c. After serving seven years and three months in prison, Marvin Mitchell was vindicated through DNA testing and his conviction for rape was vacated in 1989. The victim described her assailant to the police as having worn pink pants, while Mr. Mitchell told the police he had been wearing gray pants on the day of the attack. In addition, the victim told the officers that the assailant had one crossed eye and was clean-shaven. Mr. Mitchell, on the other hand, did not have a crossed eye and had a goatee at the time of the incident. Boston police officers Trent Holland and Robin DeMarco both falsely testified under oath that Mr. Mitchell, while being detained, had suddenly exclaimed that he had been wearing pink pants on the day the victim was attacked. Officers DeMarco and Holland have never been disciplined in connection with this misconduct.

d. A judge threw out a jury's 1989 guilty verdicts on drug charges secured through the testimony of Boston police officer Trent Holland. When Superior Court Judge Elizabeth A. Porada, who was later elevated to the Court of Appeals, threw out the verdicts, she ordered an investigation into whether or not Holland committed perjury. Judge Porada concluded that Holland's testimony about watching a drug transaction from a certain vantage point was necessarily false because his view would have been obstructed by a building. The perjury

7

investigation was conducted by Boston police Sergeant James Curran. Not only was Holland not disciplined in connection with this misconduct, he was later promoted to detective.

e. On October 23, 1989, Charles and Carol Stuart were shot in the Mission Hill neighborhood of Boston. William Bennett became a suspect and through intimidation and coercion, the police produced witnesses to implicate him. The police threatened the witnesses with arrest, physical beatings and imprisonment if they did not testify against Bennett. The police offered witnesses money and other inducements in an attempt to coerce them to testify falsely against Bennett. They supplied witnesses with crucial facts previously known to them for the purpose of enhancing the witnesses' knowledge of incriminating facts against Bennett. In addition, the police planted evidence in homes of witnesses in order to pressure them into incriminating Bennett. Bennett was, in fact, innocent of the charges.

f. On November 21, 1991, a Suffolk County grand jury returned indictments against Tarahn Harris for murder in the first degree. In his ruling in favor of Harris' Motion to Dismiss the indictment, the Honorable Isaac Borenstein, Justice of the Superior Court, found that City of Boston police officer Herbert Spellman "knowingly and intentionally falsified, recklessly fabricated, distorted, misled and deceived the grand jury." Officer Spellman distorted Harris' statement, suggesting to the jury that Harris made incriminating statements, while failing to inform the jury that Harris actually made exculpatory statements as well. He assigned to Harris statements that Harris had not made and knowledge that Harris may not have had. Judge Borenstein was "convinced that Officer Spellman knowingly falsified and distorted the evidence against Tarahn Harris...for the purpose of strengthening what appeared to be a weak case against Tarahn Harris." In response to a complaint of misconduct relating to this incident, the Boston Police Department on July 15, 1999, in spite of Judge Borenstein's findings, found the

allegations against Officer Spellman to be "Not Sustained" and the Police Commissioner accepted the finding.

g. In 1994, Jerome Goeffigan, an 11-year-old child, was murdered. Donnell Johnson was charged with the murder. The case agent, Detective William Mahoney, suppressed exculpatory evidence and lied under oath in Johnson's murder trial. Johnson was convicted but later released as an innocent man after five years in prison. Mahoney was never charged with perjury and pursuant to a compliant to internal affairs, he was found only to have been negligent in failing to turn over exculpatory evidence. Mahoney received only a 30-day suspension in 2002 that he has appealed.

(1) In 2003, Shawn Drumgold was released from prison after serving over 15 years for a crime he did not commit. Drumgold was framed by Boston police officers who purposely withheld highly exculpatory evidence. They put the key identification witness up in a hotel for several months without disclosing the fact to the defense. They also coerced witnesses to identify Drumgold and accompanied witnesses to court to clear up their pending cases after their testimony without informing the defense. None of these officers has ever been investigated for their criminal misconduct, let alone punished.

49. To this very day, the Internal Affairs Division of the Boston Police Department continues to whitewash serious complaints of police misconduct. If any misconduct is found in its investigations, it is only for a much lesser charge than merited by the evidence, and the penalty does not fit the abuse.

**WHEREFORE,** the Plaintiff respectfully requests that this Honorable Court award:

1. Compensatory damages against all Defendants;
2. Punitive damages against the individual police officer Defendants;
3. The costs of this action, including reasonable attorneys' fees; and,

4. Such other and further relief, as this Court may deem necessary and appropriate.

## DEMAND FOR JURY TRIAL

A jury trial is hereby demanded.

>Respectfully submitted
>The Plaintiff Mario Lacy,
>By his attorneys,
>
>Stephen Hrones (BBO No. 242860)
>HRONES & GARRITY
>Lewis Wharf–Bay 232
>Boston, MA 02110-3927
>T)617/227-4019

Dated: June 30, 2004