Page

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO.: 04-11492 REK

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

MARIO LACY,

    Plaintiff,

vs.

WILLIAM J. FEENEY, KENNETH

HEARNS, JUAN J. SEOANE,

and the CITY OF BOSTON,

    Defendants,

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

DEPOSITION OF:  WILLIAM J. FEENEY

HRONES & GARRITY

Lewis Wharf Bay, Suite 232

Boston, Massachusetts 02110-3927

June 01, 2005      10:07 a.m. - 10:54 a.m.

KATHRYN K. GIANNO

COURT REPORTER

Page 6

1  Q  What did they observe?
2  A  They observed a number of different
3  things. One of my officers had a confidential
4  informant make a purchase of heroin from Mr. Lacy
5  and they stopped Mr. Lacy while he was in the deal
6  with the female.
7  Q  Who stopped him?
8  A  Members of my squad.
9  Q  They actually stopped him when he was
10 negotiating the deal?
11 A  He had already had conversations with the
12 female. He went up to what my officers believed to
13 be a location where he was storing drugs. When he
14 was on his way back towards that female, they
15 stopped him.
16 Q  Where did they stop him?
17 A  On Marvin Street.
18 Q  More specifically where?
19 A  About mid on Marvin Street.
20 Q  Did they have grounds to arrest him at
21 that point?
22 A  They had probable cause to arrest him,
23 yes.
24 Q  But he wasn't arrested?

Page 7

1  A  No.
2  Q  Why not?
3  A  It was a decision at that point not to
4  arrest him.
5  Q  But you had seen him actually buying from
6  the confidential informant?
7  A  No, he was selling.
8  Q  You actually observed that?
9  A  It was observed, yes.
10 Q  You actually saw him approach a female?
11 A  A female approached him. I didn't see it,
12 my officer saw it.
13 Q  What did they observe, you know, what did
14 they say?
15     MR. CHERNETSKY: Objection.
16     THE WITNESS: They told me they had
17  observed a female in conversation with him,
18  that he walked up towards the dumpster area off
19  of Marvin Street, and when he was on his way
20  back, they stopped him.
21 Q  (By Mr. Hrones) On what basis were they
22 stopping him if they weren't going to arrest him?
23     MR. CHERNETSKY: Objection.
24     THE WITNESS: They believed at the time

Page 8

1  they stopped him he was going to have drugs on
2  him which he was going to deliver to the
3  female.
4  Q  (By Mr. Hrones) But apart from finding
5  drugs on him, they could have arrested him?
6  A  They had that discretion whether or not to
7  arrest him, yes.
8  Q  So, was there a search of Mr. Lacy?
9  A  Yes, there was.
10 Q  Did you observe it?
11 A  I didn't observe the actual search, no.
12 Q  Because you had your back to the person
13 doing the search?
14 A  That's correct.
15 Q  Did you authorize the search?
16 A  Yes, I did.
17 Q  And what type of search did you authorize?
18 A  I didn't authorize any specific search. I
19 told Officer Hearns, who was doing the search
20 because he believed that he may have some contraband
21 or a weapon on him, I told Officer Hearns if he
22 thought he had something on him to search him.
23 Q  Was a strip search conducted?
24 A  Yes, it was.

Page 9

1  Q  But you didn't see it?
2  A  No, I didn't.
3  Q  Were you informed -- how do you know it
4  was a strip search?
5  A  By our rules and regulations and
6  guidelines relative to strip search, a strip search
7  was performed.
8  Q  What are your regulations relative to the
9  strip search?
10 A  The definition of a strip search from the
11 Boston Police Department is the rearranging of
12 anybody's clothing in order to view their genitals
13 or their breasts.
14 Q  It's broader than that, isn't it buttocks
15 also?
16 A  That's correct.
17 Q  And you were told that this was done --
18 well, what were you told was done?
19 A  I wasn't told specifically what was done.
20 I told Officer Hearns if he thought he had something
21 on him to search him.
22 Q  How do you know it was a strip search?
23 A  I assumed what was going to be done, he
24 was going to look down into the pants area of Mr.

3 (Pages 6 to 9)

### Page 14

1  saying you can't do it. We are not talking about a
2  constitutional right, we are talking about a Boston
3  Police regulation, and you'll concede that it says
4  that you cannot do a strip search outside the
5  district station?
6     A   But there's more to it than that. You're
7  taking part of that sentence and --
8     Q   It says, and we are referring to Section
9  Four --
10       MR. CHERNETSKY: For the record, could you
11  give us the rule number?
12       MR. HRONES: Yes, it's Rule 318D.
13     Q   (By Mr. Hrones) Now, you're familiar with
14  this?
15     A   I am pretty familiar with that.
16     Q   It says, "Police officers are prohibited
17  from conducting a strip search outside the confines
18  of the district station unless such strip search is
19  authorized by a warrant."
20     A   Correct.
21     Q   That's not ambiguous, is it?
22     A   As far as I'm concerned it is, yes.
23     Q   But you didn't have a warrant?
24     A   The courts don't issue a warrant.

### Page 15

1     Q   But that doesn't matter, does it, whether
2  they issue them or not when the regulation says that
3  you need a warrant?
4     A   The regulation states that.
5     Q   Right.
6     A   Again, there's not a court in the state of
7  Massachusetts that issues a warrant to strip search
8  somebody outside of the district station.
9     Q   That may be true, but the regulation says
10  you need a warrant to do the search?
11     A   I understand that.
12     Q   And you had the man, the basis to arrest
13  him, didn't you?
14     A   Yes.
15     Q   So you could have gotten a warrant to
16  search him?
17     A   Again, we are getting back to warrants to
18  search people; courts don't issue warrants to search
19  people.
20     Q   Well, you don't ask for them, do you? You
21  can get a warrant to search someone?
22     A   A body cavity search, yes. But not a
23  warrant to search somebody other than a body cavity
24  search warrant.

### Page 16

1     Q   You had grounds to arrest him, so you
2  could have taken him to the district station, right?
3     A   Yes, we could have.
4     Q   And you could have strip searched him
5  there?
6     A   Yes.
7     Q   Why wasn't that done rather than doing the
8  strip search out in the open?
9       MR. CHERNETSKY: Objection.
10       THE WITNESS: Because he wasn't being
11  placed under arrest.
12     Q   (By Mr. Hrones) But you had grounds to
13  place him under arrest?
14     A   Yes, we did.
15     Q   You conceded at the other deposition that
16  the strip search violated the regulations, did you
17  not?
18     A   I don't recall.
19     Q   Now, was a police report made out in this
20  case?
21     A   No.
22     Q   If there is a strip search, you're
23  supposed to put it in the police report, aren't you?
24     A   If the strip search was done and the

### Page 17

1  person was arrested, a 1.1 would have been written
2  out, yes.
3     Q   Was a complaint sustained against you for
4  not putting a strip search in a police report in
5  another case?
6     A   Yes, it was.
7     Q   What case was that?
8     A   The Santiago matter.
9     Q   What's the status of that matter now? Is
10  it on appeal?
11     A   Yes.
12     Q   What was the penalty on that?
13     A   A two day suspension.
14     Q   So it's your position that you don't have
15  to make out a report indicating there was a strip
16  search if you don't arrest the person?
17     A   At this time, the time of this incident,
18  that was my interpretation.
19     Q   What's the law now? What's the position
20  now?
21     A   If we were to do something like that, we
22  would write out an investigative person's report and
23  indicate so in the 1.1.
24     Q   You would do a 1.1?

WILLIAM FEENEY
June 1, 2005

Page 22

1  Q  And you do searches?
2  A  Yes.
3  Q  And you do strip searches from time to
4  time, or you did at that time?
5  A  If need be, yes.
6  Q  Were you aware of a situation where the
7  officer doing the strip search requested gloves?
8  A  He did.
9  Q  Did he request them from you?
10 A  No, he asked one of the other officers.
11 Q  But you heard him?
12 A  I believe I did, yes.
13 Q  And do you know why he wanted gloves?
14    MR. CHERNETSKY: Objection.
15    THE WITNESS: He knew Mr. Lacy pretty well
16 and he believed him to be HIV positive. So for
17 his own protection he wanted to be sure he had
18 protection on his hands if he was going to
19 search him.
20 Q  (By Mr. Hrones) It's your understanding he
21 never touched the skin of Mr. Lacy, did he?
22 A  I don't know.
23 Q  You heard he pulled the underwear out, the
24 elastic of the underwear, in order to look at his

Page 23

1  rear end?
2  A  That's correct.
3  Q  So you had no information that he touched
4  the body of Mr. Lacy, did you?
5  A  No, I didn't.
6  Q  And you're aware that you can't get HIV
7  from just touching the clothing of a person?
8  A  That's correct.
9  Q  So were the gloves given to him?
10 A  We didn't have any gloves.
11 Q  Because you don't use gloves normally in
12 the street?
13 A  We normally don't, no.
14 Q  What did you use in place?
15 A  Officer Broderick (phonetic) went to the
16 trunk of his car and retrieved a couple of clear
17 plastic evidence bags that we use for bagging up
18 drug evidence and gave them to Officer Hearns.
19 Q  So he was using an evidence bag to do
20 what?
21 A  To protect his hands while he was
22 searching Mr. Lacy.
23 Q  So a lot of the people, the drug addicts
24 that you deal with in the street, they have HIV,

Page 24

1  don't they?
2  A  A percentage of them do, yes.
3  Q  But still you don't carry gloves in the
4  car when you're out in the street?
5  A  No.
6  Q  So a lot of these people are searched
7  without gloves?
8  A  A good portion of them are, yes.
9  Q  But if there was to be an anal cavity
10 search, you would want gloves, wouldn't you?
11 A  We wouldn't do an anal cavity search.
12 Q  But if you did one?
13    MR. CHERNETSKY: Objection.
14    THE WITNESS: We wouldn't do one.
15 Q  (By Mr. Hrones) You can get a warrant for
16 one, can't you?
17 A  Then it's done by a doctor in a medical
18 facility, yes.
19 Q  Have you ever seen it done?
20 A  I've applied for warrants before for body
21 cavity search warrants and had them done at the
22 hospital.
23 Q  And you've observed them?
24 A  No.

Page 25

1  Q  Now, are you aware that some feces matter
2  was found on one of the evidence bags?
3  A  Yes, I was made aware of that.
4  Q  Do you know how that got on there?
5    MR. CHERNETSKY: Objection.
6    THE WITNESS: I have no idea.
7  Q  (By Mr. Hrones) You have no idea?
8  A  No.
9  Q  Now, why was he being strip searched?
10 A  For two reasons, one was we had reason to
11 believe he may have heroin on him because he was
12 going back to, what we believe, was to deliver to
13 the female we had observed him engaged in
14 conversation with. When the officers went to frisk
15 him and pat him down, when Officer Hearns got
16 towards the front of his pants, he kept pulling
17 away.
18    And probably about a week earlier
19 than that, Officer Hearns had a similar incident in
20 the Dudley Triangle area. And when that individual
21 was brought into the station, he was found to have a
22 32 semi-automatic in the front of his pants.
23    At the time he was brought in, he was
24 dressed very similar to what Mr. Lacy was, a pair of

CATUOGNO COURT REPORTING SERVICES
Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI

### Page 30

1  A  Because there was Officer Hearns
2  performing the strip search, there was no need for
3  anybody else to watch what was going on. I was
4  facing out towards the street to provide as much
5  privacy as I could for Mr. Lacy while the strip
6  search was being conducted in case a car should
7  happen to drive up the street or if somebody should
8  happen to walk down the street.
9  Q  But the strip search didn't involve taking
10 his clothes off, did it?
11 A  No.
12 Q  It only involved Officer Hearns looking
13 down his underwear to his rear end?
14 A  That's correct.
15 Q  So no one other than Hearns could have
16 seen his rear end?
17 A  That's correct.
18 Q  So why was there a need to do a shield if
19 it was that type of strip search?
20 A  Because you still have Mr. Lacy's face,
21 people walking by might see him and wonder what's
22 going on. We try to provide as much privacy as we
23 could under the conditions we're working with.
24 Q  What time at night was it?

### Page 31

1  A  About 5:45, 6:00 p.m., somewhere around
2  there.
3  Q  Now the evidence bag, what size is that?
4  A  There was no specific size, it's
5  approximately six- or seven-inches long by about
6  four and a half, five-inches wide.
7  Q  Did it fit over his hand?
8  A  Over whose hand?
9  Q  Officer Hearns's hand?
10 A  I believe it did, yes.
11 Q  Do you remember telling Internal Affairs
12 that it did not even fit over his hand?
13 A  I don't recall making that statement.
14 Q  Have you seen this document that is a
15 summary of the interview?
16 A  This is an interview with J. Broderick,
17 this isn't my interview.
18 Q  I'm sorry, that's the end of it. Yes,
19 here it is. Oh, yeah, okay, you're correct. Your
20 interview begins at the bottom of that page, sorry
21 about that.
22     Did you review anything before coming
23 in here?
24 A  No, I didn't.

### Page 32

1  Q  Have you ever reviewed Officer Hearns's
2  deposition?
3  A  No, I haven't.
4  Q  Have you reviewed your deposition from the
5  Santiago case?
6  A  From the Santiago case?
7  Q  Yes.
8  A  I believe I did once, yes.
9     MR. HRONES: If we can just have a little
10 break?
11    MR. CHERNETSKY: Sure.
12
13    (Off the record.)
14
15 Q  (By Mr. Hrones) Officer, have the
16 regulations been changed since this incident?
17 A  No, not that I am aware of, no.
18 Q  No new regulation?
19 A  Not as far as I know.
20 Q  Any new procedures without regulations?
21 A  Nothing written in policy, not that I can
22 remember.
23 Q  Except for the fact that you don't do
24 strip searches outside the station or without a

### Page 33

1  warrant, do you?
2  A  We don't do them out on the street, if you
3  will.
4  Q  And who told you you shouldn't do that
5  anymore?
6  A  I forget who it was.
7  Q  Now, did you see any violation of police
8  regulations that night?
9  A  Not that I was aware of, no.
10 Q  You knew there was a strip search?
11 A  Yes.
12 Q  That's a violation of the regulations?
13 A  Interpretation, yeah. But, at that point
14 there, at that time at night -- or at that instance
15 I should say, not that time of night, but that
16 instance, I didn't feel it was a violation of the
17 rules and regulations.
18 Q  When did you realize it was a violation?
19 A  When it was brought to my attention some
20 days later.
21 Q  Who brought that to your attention?
22 A  Again, I don't recall. There were a
23 number of individuals I had spoken to after the
24 incident.

Page 38

1  Date:         July 8, 2005
2  To:           James M. Chernetsky, Esq.
3  Copied to:    Stephen Hrones, Esq.
4  From:         Kathryn K. Gianno
5  Deposition of: William J. Feeney
6  Taken:        June 01, 2005
7  Action:       MARIO LACY vs. WILLIAM J. FEENEY, ET
8                AL
9
10      Enclosed is a copy of the deposition
11 of WILLIAM J. FEENEY, taken on JUNE 01, 2005,
12 in the above-entitled action.
13      The deponent has thirty days to sign the
14 deposition from the date of its submission to the
15 deponent, which is the above date.
16      Have the deponent sign the enclosed signature
17 page. Any errors should be marked by page, line and
18 error on the enclosed correction sheet, and forwarded
19 to all interested parties. Please do not mark the
20 transcript itself.
21      Thank you for your cooperation.

Page 40

1         CORRECTION SHEET
2  DEPONENT: WILLIAM FEENEY
3  CASE:    LACY VS. FEENEY, ET AL
4  DATE TAKEN: 06/1/05
5  *********************************************
6  PAGE / LINE / CHANGE OR CORRECTION AND REASON
7  *********************************************
8  ___/___/_____
9  ___/___/_____
10 ___/___/_____
11 ___/___/_____
12 ___/___/_____
13 ___/___/_____
14 ___/___/_____
15 ___/___/_____
16 ___/___/_____
17 ___/___/_____
18 ___/___/_____
19 ___/___/_____
20 ___/___/_____
21 ___/___/_____
22 ___/___/_____
23 ___/___/_____

Page 39

1       UNITED STATES DISTRICT COURT
2        DISTRICT OF MASSACHUSETTS
3        CIVIL ACTION NO.: 04-11492 REK
4
5  *************************
6  MARIO LACY,                    *
7       Plaintiff,                *
8       vs.                       *
9  WILLIAM J. FEENEY, KENNETH     *
10 HEARNS, JUAN J. SEOANE,        *
11 and the CITY OF BOSTON,        *
12      Defendants,               *
13 *************************
14
15
16      I, WILLIAM J. FEENEY, do hereby certify,
17 under the pains and penalties of perjury, that the
18 foregoing testimony is true and accurate, to the
19 best of my knowledge and belief.
20      WITNESS MY HAND, this      day of
21      , 2005.
22 _____
23 WILLIAM J. FEENEY